# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

SHAWN GREEN (97-A-0801),

                                        Plaintiff,

                                                        DECISION & ORDER

                        -vs-

                                                        00-CV-6533-CJS

RICHARD MORSE AND ALAN HAGER,

                                        Defendants

## APPEARANCES

For *Plaintiff:*                    Shawn Green, *pro se*
                                    Southport Correctional Facility
                                    P.O. Box 2000
                                    Pine City, NY 14871

For *Defendants:*                   J. Richard Benitez, A.A.G.
                                    New York State Attorney General's Office
                                    144 Exchange Boulevard, Suite 200
                                    Rochester , NY 14614
                                    Tel. (585) 546-7430

## INTRODUCTION

**Siragusa, J.**  Before the Court is Defendants' motion for summary judgment (Docket No. 72) filed on March 30, 2007, in which they seek dismissal of the complaint. After taking the matter under consideration on the papers submitted in support of, and opposition to, the motion, the Court grants Defendants' motion.

# BACKGROUND

Plaintiff filed a complaint November 8, 2000, alleging that on December 2, 1997, defendants subjected him to excessive force by using a chemical agent to extract him from his cell, in violation of his Eighth Amendment right against cruel and unusual punishment. Defendants deny that they used excessive force. Rather, they maintain that any force they used was lawful and necessary to extract plaintiff after he refused direct orders to exit his cell.

On June 22, 2005, the Court entered a Decision and Order granting, in part, Defendants' motion for judgment on the pleadings (Docket No. 22) with regard to the defendants in their official capacities, and otherwise denying it with respect to the defendants in their individual capacities. On October 12, 2006, the Court entered a Decision and Order revoking Plaintiff's *in forma pauperis* status pursuant to 28 U.S.C. § 1915(g) (1996)[1] and denied Defendants' motion for summary judgment seeking dismissal of the case, since Plaintiff had already paid the filing fee. In addition, the Court denied Plaintiff's cross-motion for summary judgment.

In the present motion for summary judgment, Defendants seek dismissal of the complaint on the ground that Plaintiff will be unable to prove that the force used to extract him from his cell was excessive in violation of his Eighth Amendment rights. Their argument can be summarized by this portion of their supporting memorandum of law:

---

[1]That section provides: "In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury."

> The videotape evidence before the Court [which had not previously been presented to the Court] memorialized how the extraction occurred, and it is clear that force was needed and was used in a lawful manner. Based upon the video-tape [sic] evidence, even if the evidence is viewed in the light most favorable to the plaintiff, there is no issue material fact regarding whether any force used during the extraction was excessive. Accordingly, plaintiff's excessive force claims must be dismissed.

(Def.s' Suppl. Mem. of Law, at 10-11.) In the alternative, Defendants argue they are entitled to qualified immunity.

Plaintiff was deposed on December 21, 2006, and a copy of the deposition testimony is attached to the declaration of Tamara B. Christie (Docket No. 73). In his deposition, Plaintiff testified that he was 23 years old, previously used the name Shamal Mcgougain, and attended John Jay College in New York City for one year. (Green Dep., at 4-5.) He stated he had been convicted of robbery in the first degree and received a sentence of twenty-five years of incarceration and began his sentence on January 15, 1997. (*Id*., at 6.)

He also stated his belief that he had been convicted of possession of drugs and attempted robbery in separate instances, but the sentences for those were run together with his sentence for robbery. Additionally, he stated he had misdemeanor convictions, but served no more than a week or two in jail for those. (*Id.*, at 9.) He testified that he had held approximately 20 to 25 jobs during his lifetime before entering prison for his sentence and that his most recent job had been with Airborne Express delivering packages. Prior to that, he worked in a fast food restaurant and at a supermarket. (*Id.*, at 7-8.) Testifying concerning the events of December 2, 1997, at Southport Correctional Facility, Plaintiff testified that Morse lacked authorization to use chemical agents on him during the cell

extraction at issue, and, in that regard, that Hager unnecessarily sought approval for the use of a chemical agent to remove him from his cell. (*Id.*, at 10-11.) Further, Plaintiff contended that Defendants used a chemical agent for the purpose of causing him harm and as a means of punishment. He then described the events of December 2, 1997:

> In December of 1997 I was given some draft bags and notified I was moving to level one. About 1:20 a sergeant came to tell me he wanted to talk about me refusing not to move. Where, I don't know where he got that from, I am still baffled to this day as what caused him to come to my cell. Basically, the lieutenant came to my cell, a couple people from the facility came to my cell somewhere around 2:30; I was extracted and tear gas and chemical agents was used to remove me from the cell.

(*Id.*, at 12.) At his deposition, Plaintiff testified that he was to be moved from level 2, where he enjoyed more privileges, to level 1, where his privileges would be more restricted. (*Id.*, at 13.) He claimed he was never given a reason for the move. He also stated that the sergeant who came to talk to him was Sergeant Ganter, but does not recall what he said to the sergeant, or what the sergeant said to him, other than he was being moved to a different cell. (*Id.*, at 14-15.) Plaintiff also said that Lt. Hager came to talk to him and was upset. However, Plaintiff indicated that he did not pay attention to what Lt. Hager said. He also recalled "some people did come and talk to me, I don't remember who." (*Id.*, at 15.) Plaintiff recalled the extraction team arriving at his cell, but did not recall Lt. Hager speaking to him at the time and giving him one last chance to leave his cell voluntarily. He merely remembered that he was unconscious during the cell extraction couldn't breathe as a result of the tear gas, and recalls waking up in the shower with corrections officers cutting off his clothes. (*Id.*, at 16.) He stated he also remembered the sergeant spraying something, but did not really know what it was, and the next thing he remembered was

waking up in the shower. He believes he was in the shower to decontaminate himself. (*Id.*, at 17.) He recalls being seen by medical the next day. (*Id.*, at 17.)

Plaintiff explained his injuries resulting from the cell extraction as follows:

> I have had a wrist ailment prior to that, this was aggravated from the incident. I developed a skin disorder. I had a sinus problem to [sic] that, dealing with an incident from Rikers Island in October of 1996 that they never did fix. I was taking medication for my eyes, all the white part of my eyes was [sic] blood red for like two weeks after that incident. My vision, sometimes I am nearsighted, sometimes I am farsighted, sometimes my vision is blurry.... [Plaintiff stated he was suffering from] [p]ost traumatic stress disorder; I be [sic] catching flashbacks. I have difficulty sleeping, outbursts and things like that. I have difficulty concentrating.

(*Id.*, at 19.) He further explained that the wrist ailment resulted from the handcuffs being put on too tightly on December 2, 1997, and that prior to that date, he "got numbness in my wrist, a tingling in my hands and things of that nature. Sometimes I get a burn pain of my forearm." (*Id.*, at 20.) He indicated that after December 2, "it became a little more chronic for a period of time. It still comes backs [sic] now and then. It is not as severe as it was right after the incident." (*Id.*, at 20.) He could not answer for how long it was severe, since he was more concerned about his eyes. He recalled receiving Napros[y]n for his wrist pain, but could not recall for how long. (*Id.*, at 21.)

Plaintiff also testified that he has "been having warts on the face and fingers. I have dry, itchy and your dated skin at times." With regard to the sinus condition, Plaintiffs said, "it became more chronical [sic] after the cell extraction. I believe at the time it was also as a result of me losing temporary consciousness, I couldn't breathe." He further stated that on February 5, 2001, he "was tooken [sic] from the facility that I was into Albany med to have surgery done on my nose." (*Id.*, at 22.)

Also in his deposition, Plaintiff elaborated on his claim against Morse in the following questions and answers:

A. My claim is that the purpose and his reason for authorizing the chemical agents was not necessary and maliciously he approved of [sic] to cause me pain and suffering. He never had to training or the necessary hindsight to determine the side effects or the effects of the harm that would be caused to me as a result of using those chemical agents.

Q. And what about Mr. Hager, how do you claim Mr. Hager violated your rights on December 2, 1997?

A. Same as with the other defendant, as far as with Defendant Hager I believe his whole purpose, the [sic] demeanor from the beginning was to cause me harm.

Q. Why do you believe that?

A. From the way that he initially approached me regarding the matter.

Q. How was it that he initially approached you?

A. Like I explained before, he just came talking at me; he didn't talk to me, he talked at me.

Q. Did he tell you he wanted to hurt you?

A. I interpreted that from his body language.

Q. How, what do you mean by that, what body language did you interpret from that?

A. Lieutenant's hostility.

Q. What was his body language that said to you he was trying to hurt you?

A. He was hostile, very boisterous, he was confrontive in front of my cell, he was making more of a threat than trying to resolve the matter. I didn't know until and to this day, like I don't see why the sergeant came to my cell at 1:20. My bag wasn't packed. I wasn't moving until like 3:00 o'clock.

Q. Are you saying he was more of a threat, or are you saying he threatened you?

A. I said it was more like a threat, threatened, on a personal interpretation. He said a whole lot of things.

Q. What did he say?

A. What he said, I wasn't interested in whatever he said. It was just that, yes, I took offense to it. I didn't get into this with him.

Q. You interpreted?

A. I interpreted it that way.

Q. You interpreted it at the time as a threat?

A. Yes.

Q. But you aren't able to recall the exact words he used.

A. No. He said something, I don't recall precisely what he said.

Q. What is it that makes you believe that Mr. Morse was intentionally and deliberately trying to hurt you on that day?

* * *

A. Well, as far as a jail like Southport, it is a twenty-three hour lockdown facility, mostly, I say eighty percent or ninety percent of the jail is locked down at all times. With this defendant here, I don't believe he had a complete understanding of the situation. I believe he did not utilize the proper protocol and procedures to handle the situation accordingly.

Q. What I don't understand is what makes you think he was deliberately trying to hurt you?

A. He never ascertained facts of the situation. He blatantly authorized something, he didn't ascertain the facts or go through the proper channels and procedures to make sure what he was doing was a good faith effort, good faith effect.

Q. How do you know he didn't ascertain the facts before authorizing the chemical agents?

A. From a review of all of the paperwork I have regarding the incident.

Q. What is it from the paperwork that leads you to believe he didn't ascertain all the facts?

A. Inconsistencies in the incident that took place.

Q. What inconsistencies are you referring to?

A. As far as the lieutenant giving me orders, as far as the sergeant making allegations of me beginning to struggle with officers and things of that nature; ain't none of that took place, according to my recollection of events.

Q. Mr. Green, that concludes my questioning about the cell extraction incident. Do you have anything you would like to add about that incident, any testimony that you would like to give, other than what I have asked you today?

A. Basically, the only thing I would like to add at this time, as a result of that incident that I feel is directly connected to the incident, the post traumatic stress disorder; I be [sic] waking up at night at times with flashbacks of the event. I have, like I said, I have been having sometimes difficulty sleeping, I have been having outbursts for no reason, I have difficulty concentrating on certain things, tasks I am trying to complete. That's basically it at this time.

Q. Are you receiving any medical treatment for post traumatic stress disorder?

A. I try to receive less treatment from the Department of Corrections as possible.

(*Id.*, at 23-27.)

On November 3, 2005, the Clerk mailed Plaintiff an *Irby* notice. *See Irby v. New York City Transit Autority*, 262 F.3d 412 (2d Cir. 2001). The notice contained the following:

**RULE 56 MOTIONS FOR SUMMARY JUDGMENT - <u>IRBY</u> NOTICE**

(*See Irby v. New York City Transit Authority*, 262 F.3d 412 (2d Cir. 2001))

A party in your lawsuit has filed a motion for summary/judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, which means that summary judgment will be granted if the Court finds that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

# Failure to Respond to A Motion For Summary Judgment May Result in The Grant of Judgment in Favor of The Party Seeking Summary Judgment and The Dismissal of All or Part of The Case.

## <u>Opposing Affidavits and Exhibits</u>

Therefore, if the motion seeks summary judgment against you, you MUST submit opposing papers in the form of one or more affidavits (or affirmations) made upon the personal knowledge of the person signing each affidavit. Each affidavit must set forth admissible facts and must show that the person submitting that affidavit is competent to testify as to the matters stated therein (because he or she has personal knowledge of the facts set forth in the affidavit). If you wish to submit exhibits in opposition to the motion, you may attach to the affidavit (or submit separately) sworn or certified copies or all papers or parts thereof which are referred to in an affidavit.

## <u>Statement of Material Facts Requiring a Trial</u>

If the motion seeks summary judgment against you, you MUST also submit a separate, short, and concise statement of the material facts as to which you contend there exists a genuine issue which must be tried. See Rule 56 of the Local Rules of Civil Procedure (available on the Western District web site at www.nywd.uscourts.gov). Note that all of the material facts which have been set forth in the statement served on you by the moving party (which that party claims are material facts about which there is no genuine issue to be tried) will be deemed to have been admitted by you unless you controvert the facts in your statement of material facts presenting a genuine issue requiring a trial.

## Memorandum of Law

If the motion seeks summary judgment against you, you **MUST** also submit a separate answering memorandum of law, Local Rule 7.1 (e), which may not exceed 25 pages in length without prior approval of the Court, Local Rule 7.1 (f). Failure to comply may result in the motion being decided against the noncomplying party.

**NOTE:** If you are the party bringing the summary judgment motion, you may file reply papers ONLY if you state on the notice of motion that you wish to do so and/or if the court order scheduling the motion gives you the opportunity for doing so. *See* Local Rules of Civil Procedure Rule 7.1 (c).

(*Irby* Notice, Docket No. 51 (emphasis in original).)


## STANDARDS OF LAW

### *Summary Judgment Standard*

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "[T]he movant must make a *prima facie* showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). That is, the burden is on the moving party to demonstrate that the evidence creates no genuine issue of material fact. *See Amaker v. Foley,* 274 F.3d 677 (2d Cir. 2001); *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893

(3d Cir.1987) (*en banc*). Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

Once that burden has been met, the burden then shifts to the non–moving party to demonstrate that, as to a material fact, a genuine issue exists. Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A fact is "material" only if the fact has some affect on the outcome of the suit. *Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir. 1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine issue exists as to a material fact, the court must view underlying facts contained in affidavits, attached exhibits, and depositions in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Moreover, the court must draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party. *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993); *Anderson*, 477 U.S. at 248-49; *Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38, 47 (2d Cir. 2001), *rev'd on other grounds Connecticut Dept. of Public Safety v. Doe*, 538 U.S. 1, 123 S.Ct. 1160 (2003); *International Raw Materials, Ltd. v. Stauffer Chemical Co.*, 898 F.2d 946 (3d Cir. 1990). However, a summary judgment motion will not be defeated on the basis of conjecture or surmise or merely upon a "metaphysical doubt" concerning the facts. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)); *Knight v. United States Fire Ins. Co.*, 804 F.2d 9 (2d Cir. 1986). Rather, evidentiary proof in admissible form is required. Fed. R.

Cɪᴠ. P. 56(e). Furthermore, the party opposing summary judgment "may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. New York City, Department of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996).

### Eighth Amendment Standard

The Eighth Amendment to the Constitution provides that, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The Supreme Court has stated that,

> whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in *Whitley*: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.

*Hudson v. McMillian*, 503 U.S. 1, 7 (1992).

### Pro Se Papers

In *Triestman v. Federal Bureau of Prisons*, 470 F.3d 471 (2d Cir. 1006), the Second Circuit recognized that,

> [i]t is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted "to raise the strongest arguments that they *suggest.*" *Pabon* [*v. Wright*], 459 F.3d [241] at 248 (emphasis added) (quoting *Burgos* [*v. Hopkins*], 14 F.3d [787] at 790); *see also Brownell v. Krom*, 446 F.3d 305, 310 (2d Cir. 2006); *Forsyth v. Fed'n Employment & Guidance Serv.*, 409 F.3d 565, 569 (2d Cir. 2005); *Sharpe v. Conole*, 386 F.3d 482, 484 (2d Cir. 2004); *Wright v. Comm'r.*, 381 F.3d 41, 44 (2d Cir. 2004); *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003); *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003); *Weixel v. New York City Bd of Educ.*, 287 F.3d 138, 145-46 (2d Cir. 2002); *Cruz v. Gomez*, 202 F.3d 593, 597 (2d Cir. 2000); *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999); *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996).

This policy of liberally construing pro se submissions is driven by the understanding that "[i]mplicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983); *see also Ruotolo v. I.R.S.*, 28 F.3d 6, 8 (2d Cir. 1994) (recognizing that *pro se* litigants must be accorded "special solicitude"). *See generally* Jonathan D. Rosenbloom, Exploring Methods to Improve Management and Fairness in *Pro Se* Cases: A Study of the *Pro Se* Docket in the Southern District of New York, 30 FORDHAM URB. L.J. 305, 380 (2002) ("In this time of ever increasing legal costs and complexity of litigation, the pro se litigant is at an insurmountable disadvantage.").

*Triestman*, 470 F.3d at 475.

## ANALYSIS

Defendants contend that Plaintiff's use of force claims must be dismissed since "[t]he record is void of any suggestion that Defendants acted maliciously." (Def.s' Suppl. Mem. of Law, at 10.) Relying heavily on the video evidence submitted to the Court and Plaintiff in support of their motion, Defendants argue further:

Additionally, the undisputed video-tape[2] evidence illustrates that any force used by defendants was reasonable and not excessive. The plaintiff's failure to comply with the staff's order to move cell locations necessitated the use of force. It is undisputed that plaintiff was violating the prison rules and a forcible extraction was in order. Therefore the Court can decide as a matter of law that force was necessary to remove plaintiff from his cell. It is clear that prison officials are given deference in the manner that they maintain institutional security and therefore the method of the extraction should not be questioned. The videotape evidence before the Court memorialized how the extraction occurred, and it is clear that force was needed and was used in a

---

[2]The recording was originally copied onto a video tape for the Court, and, at the Court's request, subsequently provided on a DVD disc.

lawful manner. Based upon the video-tape evidence, even if the evidence is viewed in the light most favorable to the plaintiff, there is no issue of material fact regarding whether any force used during the extraction was excessive. Accordingly, plaintiff's excessive force claims must be dismissed.

(*Id.*, at 10-11 (footnote omitted).)

## A

Typically, excessive force claims present material issues of fact which preclude summary judgment. However, defendants cite to an unpublished decision by the Honorable David G. Larimer, United States District Judge, in *Allaway v. McGinnis*, No. 03-CV-6071 (W.D.N.Y. Feb. 8, 2007). In his decision, Judge Larimer granted the defendants' motion for summary judgment on the plaintiff's excessive force claim, concluding that the evidentiary proof showed that "no constitutional violation occurred." *Id.*, slip opn., at 5. He then summarized the video evidence presented on the motion:

In the case at bar, defendants have submitted a videotape of the incident giving rise to plaintiffs excessive-force claim. On the tape, which was taken on the afternoon of May 28, 1999, a correction officer explains that Allaway is refusing to come out of his outdoor exercise "pen." The officer walks up to the door of the pen, which is enclosed by a wire mesh or chain-link fence, and asks plaintiff to come out. Allaway, who is leaning against one side of the fence several feet away, refuses. The officer asks Allaway several times to exit "the easy way," and assures plaintiff that nothing will happen to him if he comes out voluntarily, but Allaway does not respond.

A six-man extraction team wearing helmets and body armor then approach the pen. Allaway is given one last chance to come out voluntarily, but he again refuses. As an officer begins to unlock the door, Allaway turns to face the door, and he appears to tense his body as if preparing either to defend himself or to charge. As soon as the door opens, Allaway lunges toward the doorway, where he is immediately met by the lead officer, who is wearing a transparent plexiglass shield on his arm. The officers enter the pen, wrestling Allaway to the ground.

From that point, Allaway is surrounded by the officers and is not clearly visible for much of the time, but it appears that he continues to struggle even after he is on the ground, and that the officers are trying with some difficulty to get his hands behind his back and handcuff him. During this struggle, one officer, whom defendants have identified as defendant Randy Banks, who is also down on the ground, is seen cocking his right arm back a short distance and punching Allaway a total of four times. Eventually Allaway is subdued, after which he is placed on a gurney and removed from the pen.

*Allaway*, slip opn., at 6-7. Judge Larimer concluded that after viewing the video tape evidence in the light most favorable to the plaintiff, that the plaintiff's refusal to leave his "pen" as directed justified the use of force, and that no jury could conclude that the force used met the requirements for a constitutional violation. *Id*., slip opn., at 7. Judge Larimer cited to other cases in which summary judgment was granted based on video evidence in cases claiming a use of excessive force:

*See Stanley v. Hejirika*, 134 F.3d 629, 635-36 (41h Cir. 1998) (videotape of incident between inmate plaintiff and defendant officers "reveal[ed] no evidence of malicious or sadistic conduct" on defendants' part; although the "officers used significant physical force in subduing Stanley, ... they also had objectively reasonable grounds to believe that such force was necessary, and hence were entitled to judgment in their favor); *Brown v. Mravintz*, No. CIY A 04-30J, 2006 WL 3717417, at *8 (W.D. Pa. Dec. 14, 2006) (defendants were entitled to summary judgment on inmate's excessive-force claim, since no reasonable juror viewing videotape of incident could find for plaintiff); *Felder v. New Jersey*, No. 03-6100, 2006 WL 3751347, at *5 (D.N.J. Dec. 19, 2006) ("no reasonable fact finder could conclude, based on the evidence in the record, that the Correction Officers violated Plaintiffs Eighth Amendment right against excessive force," where videotape showed that officers "were professional and did not exert excessive force to extract Plaintiff from his cell"); *Martin v. Serrell*, No. 4:03CV3130, 2006 WL 488718, at *3 (D. Neb. Feb. 27, 2006) (stating that "[t]he videotape of the search [of inmate's person] does not reveal the kind of unnecessary and wanton infliction of pain prohibited by the Eighth Amendment." and that "the entire process, insofar as it could be observed, involved no excessive force. and no unduly aggressive behavior. verbal abuse or unprofessional conduct"); *Boomer v. Lanigan*, No. 00 Civ. 5540, 2002 WL 31413804, at *6 (S.D.N.Y.

Oct. 25, 2002) (where inmate plaintiff "presented no evidence in response to the DOCS Defendants' video tape or motion papers," plaintiff could not establish that extraction team members acted with wantonness or that their use of force constituted an objectively sufficiently serious deprivation of his constitutional rights); *see also El v. Ordiway*, 198 F.3d 244 (table), 1999 WL 993891, at *1 (6th Cir. 1999) (district court properly granted summary judgment for defendants on inmate's excessive-force claim, since videotape supported defendants' account of incident, in which plaintiff refused to follow orders, thereby forcing officers to physically restrain him).

*Allaway*, slip opn., at 7-8. The United States Supreme Court observed in a case that was before them, and which involved video evidence,

> [a]t the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. Rule Civ. Proc. 56(c). As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (footnote omitted). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.
>
> That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life. Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

*Scott v. Harris*, 550 U.S. 732, ___, 127 S. Ct. 1769, 1776 (2007). The record in *Scott* included a videotape of the car chase at issue in the litigation. Justice Scalia described the

Circuit Court's description of the event as follows: "reading the lower court's opinion, one gets the impression that respondent, rather than fleeing from police, was attempting to pass his driving test:…" *Id.*, at 378-79. Justice Scalia went on to detail what he observed the videotape to depict:

> The videotape tells quite a different story. There we see respondent's vehicle racing down narrow, two-lane roads in the dead of night at speeds that are shockingly fast. We see it swerve around more than a dozen other cars, cross the double-yellow line, and force cars traveling in both directions to their respective shoulders to avoid being hit.[3] We see it run multiple red lights and travel for considerable periods of time in the occasional center left-turn-only lane, chased by numerous police cars forced to engage in the same hazardous maneuvers just to keep up. Far from being the cautious and controlled driver the lower court depicts, what we see on the video more closely resembles a Hollywood-style car chase of the most frightening sort, placing police officers and innocent bystanders alike at great risk of serious injury.

*Scott*, 550 U.S. at 379-80 (footnote omitted). Based upon *Scott*, as well as Judge Larimer's opinion in *Allaway*, and the cases upon which he relies, the Court concludes that it may reasonably rely on the video evidence presented in this case in deciding whether to grant summary judgment on Plaintiff's use of force claim. In that regard, such evidence clearly shows that some use of force was necessary.

--------

[3]In footnote 6 of the *Scott* opinion, Justice Scalia wrote, "Justice Stevens hypothesizes that these cars 'had already pulled to the side of the road or were driving along the shoulder because they heard the police sirens or saw the flashing lights,' so that '[a] jury could certainly conclude that those motorists were exposed to no greater risk than persons who take the same action in response to a speeding ambulance.' *Post*, at ____, 167 L. Ed. 2d, at 701. It is not our experience that ambulances and fire engines careen down two-lane roads at 85-plus miles per hour, with an unmarked scout car out in front of them. The risk they pose to the public is vastly less than what respondent created here. But even if that were not so, it would in no way lead to the conclusion that it was unreasonable to eliminate the threat to life that respondent posed. Society accepts the risk of speeding ambulances and fire engines in order to save life and property; it need not (and assuredly does not) accept a similar risk posed by a reckless motorist fleeing the police." *Scott*, 550 U.S. at 379, n.6.

**B**

The video tape of the cell extraction submitted by Defendants starts with Lieutenant Hager stating that the date is December 2, 1997. He then he looks at his watch and states that the time is 3:11 p.m. The video tape itself lists the time as 3:14 p.m., with a counter in hours, minutes and seconds. Lieutenant Hager's statement is made in the first seven seconds of the video. Lieutenant Hager announces to the recorder that Plaintiff (identifying him by name and department identification number) is refusing to return to level one as part of a disciplinary proceeding that took place approximately three weeks prior. Lieutenant Hager than identifies each member of the cell extraction team by rank and last name. Lieutenant Hager indicates that several individuals (he names them) spoke with Plaintiff, but that he still refuses to move. After this introduction, the scene shifts to the cell block with the cell extraction team and Lieutenant Hager shown in front of one of the cell doors and Lieutenant Hager is reading from a card held in his hand: "Green, I'm going to give you one last direct order." Lieutenant Hager then directs Plaintiff to comply with the order and leave his cell before physical force is used. Plaintiff is heard to say "no" then Lieutenant Hager turns to Sergeant Sepio and tells him that he has permission to use the chemical agent. Sergeant Sepio, who is wearing a gas mask and holding a small canister, then says he is going to spray two one-second bursts into the cell, and immediately does so. He then says to Plaintiff, twice: "Green, come over here to the door and kneel down." Then Sergeant Sepko is heard saying, "back to the door," twice and repeating the instruction to kneel, not sit. The door is opened and the cell extraction team rushes in, pinning Plaintiff down on his cot, and hand cuffing him. A few second later, Plaintiff starts

saying, in an increasingly panicked voice, "I can't breathe." He repeats this several times, even as the team carries him out of the cell and while the camera follows them down the hall to the shower.

Once outside the shower, Plaintiff is held as a nurse examines him. The nurse is not wearing any protective gear (the cell extraction team has on white one-piece suits and gas masks). She agrees that Plaintiff is "all set" and can go into the shower. When Plaintiff arrives at the shower, the water is already running and the extraction team starts to remove his clothing. Plaintiff is not speaking during the first portion of this part of the recording, but later repeats that he cannot breathe, asking the officers, to "help my breath." The officers tell Plaintiff to keep his face in the water to wash the gas off. Plaintiff's speech becomes increasingly louder, and he begins shouting "give me some air." The officers repeat that he should keep his face in the water. Plaintiff responds, "I need some oxygen, where the oxygen?" The recording pans slightly left to show that the nurse is also observing this process. Plaintiff states, "these cats is wired me the fuck up and I can't get no breath. What water got to do with air, what the water got to do with air?" At this point in the recording, Plaintiff is speaking, shouting and talking continuously. As the recording progresses, Plaintiff starts questioning why his clothing is being removed and why he is being wet down in the shower. Once all but his boxer shorts, socks and sneakers have been removed, Plaintiff is shown being photographed, and the nurse is explaining to him that he is having the gas washed off. Plaintiff then asks how he got from his cell all the way to the shower, and why he is all wet. There is no visible injury to Plaintiff in the video recording, and he appears to be breathing normally and no longer in distress. The recording lasts for 17 minutes and 56 seconds, and ends as Plaintiff is placed in another cell with the nurse

approaching the door as the recording fades to black.

C

On July 5, 2007, Plaintiff filed a response (Docket No. 85) in opposition to Defendants' motion. In his response, which is sworn, Plaintiff contends that he "pose[d] no threat to the safety of staff or inmates confine[d] to a cell, nor did [the] situation create an emergency. *See* Unusual Incident Report." (Pl.'s Response, at 1.) Plaintiff's response does not contain the Unusual Incident Report he cites.

Attached to the declaration of Richard Morse, retired Superintendent of Security at Southport, is a copy of DOCS Directive 4903 as well as "the unusual incident report." (Morse Decl. ¶ 7.) The Unusual Incident Report is dated December 2, 1997, and contains the following information in the Description portion (the entire report is written capital letters):

> INMATE GREEN, 97A0801, REFUSED STAFF ORDERS TO MOVE FROM LEVEL 2 CELL A-6-5 TO LEVEL 1 CELL A-1-7 FOR DISCIPLINARY REASONS. LT. HAGER, CUI REP. CERIO AND IMAN MUSSALIHATTILAL. ALL SPOKE TO HIM AND HE FAILED TO RESPOND. AN EXTRACTION TEAM WAS ASSEMBLED AND ACTING SUPT. MORSE THEN AUTHORIZED THE USE OF CHEMICAL AGENTS. LT. HAGER THEN GAVE HIM ONE LAST ORDER WHICH HE REFUSED. SGT. SEPIOL THEN ADMINISTERED 2-·1 SECOND BURSTS AT WHICH TIME INMATE GREEN SAID HE HAD ENOUGH, INMATE WAS ORDERED TO BACK UP TO THE CELL DOOR AT WHICH TIME HE SAID HE COULD NOT STAND. SGT. SEPIOL GAVE HIM AN ORDER TO KNEEL ON THE FLOOR BY HIS CELL DOOR WHICH HE COMPLIED WITH. WHEN HIS CELL ODOR WAS OPENED, HE BEGAN TO STRUGGLE WITH THE OFFICERS AND CO HUFFNER USED THE SHIELD TO GAIN CONTROL OF HIM. CHEMICAL AGENT USED WAS 587 DUST.

(Use of Force Report, at 1.) Morse's declaration also contains a record showing that he received four hours of chemical agents training on March 2, 1998 and on March 12, 1997,

-20-

and that he passed the training. (Morse Decl., Ex. C.) Attached to the declaration of Alan Hager (Docket No. 75), is a record of his training for use of chemical agents which shows he received four hours of training on March 28, 1997, and four additional hours on May 14, 1997, and that he passed both courses.

DOCS Directive 4903, dated May 23, 1995, entitled Use of Chemical Agents, states that,

> The use of chemical agents has proven to be an effective method in preventing the loss of authority without resorting to physical contact or deadly physical force. Chemical agents are to be used in emergencies such as in preventing escapes, assaults, disorders, and injury to others or to control inmates as related to the immediate safety of the inmate or others.

(DOCS Directive 4903, at I.) The Directive details the procedures to be used to obtain authorization to use a chemical agent, and how such agent should be used. (DOCS Directive 4903, at IV & V.) As required by the directive, corrections staff engaged several individuals, including "a member of the facility Ministerial Services staff." (DOCS Directive 4903, at V.E.2) to try to convince Plaintiff to follow directions to leave his cell prior to the use of the chemical agent. As Acting Superintendent, Morse had authority to authorize the use of the chemical agent. (DOCS Directive 4903, at IV. A.) Also in accordance with the Directive, the on-site supervisor was present during the administration of the two one-second bursts of the agent, and Plaintiff was not left unattended. (DOCS Directive 4903, at V.A.) Once he complied, no further agent was used, and Defendants followed the Directive's procedures for decontamination. (DOCS Directive 4903, at VI.)

Attached as an exhibit to the declaration of Karen Dyal Weaver, a DOCS Nurse at Southport, is a document entitled "Use of Force Report (cont'd)." In that report, she notes

a small laceration to Plaintiff's upper lip, and that the lip had stopped bleeding by the time Plaintiff's shower was over. She also notes that Plaintiff complained of wrist pain from the cuffs, but that she observed no discoloration and that Plaintiff had good range of motion in both hands. Consequently, she concluded that no treatment was necessary. (Weaver Decl., Ex. A, at 1.)

Plaintiff also argues that Hager "maliciously sought authorization for the use of chemical agents on plaintiff for a situation not warranting its usage." (Pl.'s Response, at 1.) The Directive 4903 authorizes the use of a chemical agent *either* for an emergency, or to control inmates. Morse contends that the use of chemical agents for cell extraction results in fewer injuries to inmates and staff. The Court's research found the decision of *Thomas v. McNeil*, No. 3:04-cv-917-J-32JRK, 2009 WL 64616 (M.D. Fla. Jan. 9, 2009), in which the district court stated:

> During the late 1990s, the primary method by which correctional officers at FSP gained a recalcitrant inmate's compliance with an order was by cell extraction. In a cell extraction, a team of five correctional officers enters an inmate's cell and forcibly restrains and removes him. Most inmates (and often the guards as well) suffer injuries during a cell extraction. In 1999, inmate Frank Valdes died at FSP as a result of correctional officers' actions during a cell extraction—the medical examiner found that Valdes was likely beaten to death. Shortly after that incident, use of chemical agents became the primary method of enforcing the rules where non-spontaneous force is needed. Records from 2000 through 2006 show that chemical agents were used on inmates at FSP hundreds of times each year (including a high of over 600 times in 2003).

*Thomas*, 2009 WL 64616, at *2 (footnote and citation omitted). In *Thomas*, the chemical agent used was "orthochlorbenzal malononitrile ('CS') sometimes called tear gas." *Id.*, at

*3 (footnote omitted). Orthochlorbenzal malononitrile[4] is the same chemical agent authorized for use by DOCS. Also instructive is a Sixth Circuit unpublished case in which that court stated that the plaintiff, Leonard,

> refused repeated orders to go to the front of his cell and be restrained while the cell was searched. He told an officer to "bring the gas," covered his face with a make-shift mask, and hid behind a rolled-up mattress. Warden Pennell authorized the use of chemical agents. Bowers applied the chemical agent and an extraction team entered Leonard's cell after he continued to refuse to go the cell door. Hoover used a shield to hold Leonard face-down on the ground. Several officers who witnessed the extraction all stated that Leonard attempted to kick and "head-butt" Hoover, while Leonard maintained that he did not resist after the extraction team entered his cell. Hoover employed the "mandibular angle hold," and the extraction team applied arm and leg restraints and removed Leonard from the cell.

*Leonard v. Hoover*, No. 03-1398, 76 Fed. Appx. 55, 57, 2003 WL 22170654, 2 (6th Cir. 2003). After reciting those facts, the Sixth Circuit concluded that:

> There was no genuine issue as to any material fact, and the defendants were entitled to a judgment as a matter of law. See Fed. R. Civ. P. 56(c). The officers had reason to believe Leonard had dangerous contraband, and his repeated refusals to comply with orders to submit to a search justified the application of force. Indeed, Leonard did not deny that he told an officer to "bring the gas" and that he covered his face. "[T]he use of mace[5] to control a prison inmate is not malicious or sadistic." *Combs v. Wilkinson*, 315 F.3d 548, 557 (6th Cir.2002). In this case, Leonard invited the use of the chemical agent. Moreover, he suffered only minor injuries as a result of the extraction. No jury could reasonably find that the defendants violated Leonard's Eighth Amendment rights.

*Leonard*, 76 Fed. Appx. at 57. The evidence presented to the Court on this motion, both

---

[4] This type of gas is also called o-chlorobenzylidenemalononitrile. "CS." Encyclopædia Britannica. 2009. Encyclopædia Britannica Online. 03 Apr. 2009 (*available at* http://www.britannica.com/EBchecked/topic/145381/CS).

[5] The principal component of Mace is CN, or ω-chloroacetophenone. *Id*.

the written declarations as well as the video tape of the actual extraction procedure, conclusively demonstrates that there is no material issue of fact and that Defendants have proven they used the chemical agent as authorized by the Directive. The video tape established that the use of force was not excessive.

**D**

Plaintiff also argues that since Defendants knew of his preexisting sinus condition, which the application of the chemical agent exacerbated, they should never have authorized the use of the chemical agent. In support of this argument, he attaches a New York State Department of Correctional Services Health Services System Request and Report of Consultation, dated February 5, 2001. Under "reason for consultation" is written the following:

> F/U FOR RHINO/SINO PROBLEM, NOT IMPROVING ON ALLEGRA AND RHINOCORT SPRAY. STILL WITH SINUS PAIN AND DIFFICULTY BREATHING OUT OF NOSE. TURBINATES ARE HYPERTROPHIED. OTO REQUESTED SEPTOPLASTY W/ TURB CAUT.

(Pl.'s Response, Ex. 4.) The doctor's handwriting seems to indicate that he cauterized Plaintiff's turbinates and performed a septoplasty, setting a follow up appointment in ten days to two weeks to remove the splints. (*Id*.) The report does not indicate that the use of a chemical agent aggravated Plaintiff's preexisting condition. Earlier ambulatory health records attached to Plaintiff's papers indicate only that he suffered from a sinus condition and numbness in both hands, which he had experienced over several months. The November 26, 1997, report shows that Plaintiff had a good range of motion in his hands, the color was good, he had equal grips, and good capillary refill. He was given Naprosyn and Sudafed. (Pl.'s Response, Ex. 2, at 1.)

Another medical record attached to Plaintiff's papers, reveals that he was seen on December 2, 1997, at 3:30 p.m., subsequent to the incident, complaining of wrist pain, but that he had no discoloration, broken skin or swelling, and had good range of motion. In addition, that record reports that Plaintiff refused to cooperate with an eye wash and stated he did not need it. (Pl.'s Response, Ex. 2.)

Plaintiff was again seen on December 3, 1997, the day following the cell extraction, for extremely red eyes, almost heamorrhagic. He was given Cortisporin[6] ointment for his eyes and, when seen two days later, reported that his eyes felt better. On December 6, 1997, his eyes were less red and the issue seemed to be resolving. He also stated that his vision was clear. (Pl.'s Response, Ex. 1, at 1.) Plaintiff was also seen on December 10, 1997, and, although his eyes were still red, he denied "pain, diplopia, blurriness." (Pl.'s Response, Ex. 1, at 2.) On December 11, 1997, Plaintiff stated that his vision was still clear, and he was continuing to use the Cortisporin. On December 11, 1997, the nurse noted that both of Plaintiff's eyes were extremely red and heamorrhagic in appearance. Plaintiff told her that he had not been using the eye ointment he had been given on December 3, 1997, and showed her that the tube was almost full. She advised him to continue use of the Cortisporin ointment twice daily. Plaintiff had no complaints of eye pain, and, though he did complain of wrist pain, no swelling was observed and he had a good range of motion. (Pl.'s Response, Ex. 1, at 2.) Plaintiff obtained new glasses on December

---

[6]NEOMYCIN, POLYMYXIN B, AND HYDROCORTISONE (Ophthalmic), a "combination of antibiotic and cortisone-like medicine" used to "treat infections of the eye and help provide relief from redness, irritation, and discomfort of certain eye problems." Drugs.com, "NEOMYCIN, POLYMYXIN B, AND HYDROCORTISONE (Ophthalmic)" (*available at* http://www.drugs.com/cons/cortisporin-eye-ear-suspension-ophthalmic.html).

13, 1997, and again on June 4, 1998. (Pl.'s Response, Ex.1, at 3.)

An ambulatory health record dated December 16, 1997, indicates that although Plaintiff was complaining of pain and numbness in both hands, he had good range of motion, the color was good, his hands were warm to the touch, and no swelling or bruising was noted. He was advised to use cool compresses as needed, and given Ibuprofen. The same report also states that his eyes showed some improvement, that they were not as red and some white was now showing. Plaintiff told the nurse that he was using the eye ointment as he had been ordered. On December 23, 1997, Plaintiff again complained of numbness in his hands, and the nurse noted no loss of function or decrease in range of motion. (Pl.'s Response, Ex. 2., at 3.) On December 28, 1997, Plaintiff again complained of wrist pain, but the nurse wrote that, "when questioned, he admitted that the numbness was gone and just had pain to wrists. No radiation, just to wrist areas dorsally." (Pl.'s Response, Ex. 2, at 5.) Plaintiff complained of wrist pain once more on January 17, 1998, and, on January 22, 1998, he complained of sinus congestion. (Pl.'s Response, Ex. 2, at 6.) On July 23, 2004, Plaintiff was seen for verruca vulgaris (warts) and xerosis (dry skin). He was treated for the warts, and told to use Dove or Aveeno soap for bathing.

The medical records Plaintiff included do not support his conclusion that the use of the chemical agent during the cell extraction exacerbated his pre-existing sinus condition or for that matter any other pre-existing condition, nor do they even raise a question of fact in that regard. As stated above, the Court's core inquiry for an excessive force claim is, "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). The evidence before the Court, including the video tape of the cell extraction, the medical

records submitted by Plaintiff, and the declarations from both sides, lead to the conclusion that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In view of the Courts determination, there is no need to address Defendants' qualified immunity argument.

**CONCLUSION**

For the reasons stated above, the Court grants Defendants' motion (Docket No. 72) and directs the Clerk to enter judgment for Defendants and close this case.

IT IS SO ORDERED.

Dated:   May 15, 2009
         Rochester, New York

ENTER:

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge